MORRIS LAW GROUP
Robert McCoy, No. 9121
Email:  rrm@morrislawgroup.com
Joni A. Jamison, No. 11614
Email:  jaj@morrislawgroup.com
900 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada  89101
Telephone:  (702) 474-9400
Facsimile:  (702) 474-9422

ATER WYNNE LLP
Frank V. Langfitt III (pro hac vice to be submitted)
Email:  fvl@aterwynne.com
James B. Davidson (pro hac vice to be submitted)
Email:  jbd@aterwynne.com
1331 NW Lovejoy Street, Suite 900
Portland, Oregon 97209-2785
Telephone:  (503) 226-1191
Facsimile:  (503) 226-0079

Attorneys for Plaintiff Federal Deposit
Insurance Corporation as Receiver for
Security Savings Bank

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR SECURITY SAVINGS BANK, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| KELLY JONES, STEPHEN DERVENIS, and THOMAS PROCOPIO, | |
| Defendants. | |

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

Plaintiff, the Federal Deposit Insurance Corporation as Receiver for Security Savings Bank, Henderson, Nevada ("FDIC-R") complains and alleges against defendants as follows:

## I.  INTRODUCTION

1.  The Federal Deposit Insurance Corporation ("FDIC") brings this lawsuit in its capacity as Receiver for Security Savings Bank (the "Bank") pursuant to authority granted by 12 U.S.C. § 1821.

2.  The FDIC-R seeks to recover damages in excess of $13.1 million because Kelly Jones ("Jones"), Stephen Dervenis ("Dervenis"), and Thomas Procopio ("Procopio") (collectively the "Defendants") – three of the Bank's former officers and/or directors – underwrote, recommended, and/or voted to approve at least seven high-risk commercial real estate ("CRE")  and acquisition, development, and construction ("ADC") loans (collectively, the "Loan Transactions") in violation of the Bank's lending policies and clear principles of safety and soundness.

3.  Defendants' roles as underwriters of the Bank's loans required that, before recommending a loan for approval, they ensured the loan was properly documented, complied with the loan policy, was adequately supported, and demonstrated a strong likelihood of repayment. Defendants were further required to provide accurate and full disclosures to the Loan Committee members to enable them to make informed decisions regarding the requested credits.  As approvers and recommenders of the loans, Defendants had a duty to ensure compliance with the Bank's loan policies and safe and sound banking practices, and to make informed decisions that were in the best interests of the Bank. Specifically, Defendants were required to ensure that the borrowers were credit worthy, that there was a clear source of repayment, and that the loan would not result in unnecessary risk to the Bank.

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101

702/474-9400 • FAX 702/474-9422

4.     Defendants wholly abdicated each and every one of these responsibilities by repeatedly disregarding the Bank's loan policies and safe and sound banking practices, including causing the Bank to loan millions of dollars to borrowers who had no adequate means to repay the loans in the event the proposed projects failed or underperformed.  Each of the Loan Transactions was a loan participation – *i.e.*, a loan that was originated by another bank, but funded by two or more banks.  Although these loans **required** independent underwriting, Defendants failed to conduct complete, independent underwriting on a single loan, instead relying extensively on the underwriting of the lead bank.

5.     Defendants knew or should have known that such reliance was reckless and represented indifference to their duties to the Bank.   By these acts and omissions, Defendants created obvious risks of injury to the Bank from specific loans that they knew or were reckless for not knowing were extremely unlikely to be paid back.

6.     Each of the loan transactions suffered from multiple and egregious deficiencies that made the high risk of loss clear.  In particular, each loan lacked adequate repayment sources and was undercollateralized, information that Defendants knew or to which Defendants chose to turn a blind eye.  Moreover, Jones, Dervenis, and Procopio withheld information about these deficiencies and provided exaggerated information to the other members of the Loan Committee and the Board of Directors regarding these Loan Transactions, thereby making the transaction appear less risky than they, in fact, were.

7.     For each of the Loan Transactions, the Defendants failed to perform the independent underwriting required by the Bank's policies and written agreements; failed to obtain or analyze Loan repayment sources; failed to analyze the impact of project zoning and permit

requirements; failed to analyze or prudently analyze borrower and guarantor financial information and ability to pay; and failed to adequately address project viability in light of local market conditions.

8.     Defendants' actions and inactions were particularly egregious in light of the Bank's high concentration in high-risk CRE and ADC loans.  Defendants' recommendation and approval of poorly underwritten CRE and ADC loans for projects that were in overvalued markets increased the likelihood of loss to the Bank, and warranted increased caution, strict adherence to loan policies, and steps to minimize risk.  Instead of taking such steps, Defendants' took the opposite tack, ignoring the Bank's lending policies and disregarding basic principles of safety and soundness to enable them to forge ahead with unsuitable loans.

9.     The Defendants were grossly negligent, and breached their fiduciary duties to the Bank by, among other things:  failing to conduct the required due diligence and analysis in underwriting, recommending, presenting, and approving the Loan Transactions that resulted in damages to the Bank; underwriting, recommending, presenting, and approving the Loan Transactions in violation of the Bank's Loan Standards and Administration Policy and Participation Loan Purchase Policy (collectively, the "Loan Policy") and prudent, safe, and sound lending practices; and failing to inform the Bank's Board of Directors ("Board") of deficiencies with respect to those loans.  The Defendants are liable for the damages that the Bank suffered as a result of their gross negligence and breaches of fiduciary duties, which includes loss of both operating capital and lost investment opportunities.

10.     The FDIC-R seeks recovery of damages caused by the Defendants' gross negligence and breaches of fiduciary duties in causing the Bank to violate its own policies and to violate prudent, safe, and sound

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422
MORRIS LAW GROUP

banking practices. In this lawsuit, the FDIC-R seeks to collect damages flowing from Defendants' gross negligence and breaches of fiduciary duties.

**II.     PARTIES**

11.     Plaintiff is the FDIC in its capacity as Receiver of the Bank, pursuant to 12 U.S.C. § 1811, et seq. Prior to its failure, the Bank was insured by the FDIC. On February 27, 2009, the Bank was closed by the Nevada Department of Business and Industry, Financial Institutions Division ("NFID") and the FDIC was appointed as Receiver pursuant to 12 U.S.C. 1821(c). At that time, the FDIC-R succeeded to all the rights, titles, and privileges of the Bank and its depositors, account holders, other creditors, and stockholders. 12 U.S.C. 1821(d)(2)(A)(i).

12.     Defendant Kelly Jones is a former officer and director of the Bank. Jones was Chief Executive Officer ("CEO") from on or about October 2004, until September 25, 2008, when he resigned. Jones was a director of the Bank from on or about October 2004 to January 2009. Jones was a member of the Bank's Investment and Loan Committee ("Loan Committee") from on or about October 2004 to June 2008. Based on information and belief, Jones currently resides in Dallas, Texas.

13.     Defendant Stephen Dervenis is a former officer and director of the Bank. Dervenis was President, Chief Credit Officer ("CCO"), and a director of the Bank from on or about October 2004, until September 25, 2008, when he resigned. Dervenis was a member of the Bank's Loan Committee from on or about October 2004 to June 2008. Based on information and belief, Dervenis currently resides in Great Falls, Virginia.

14.     Defendant Thomas Procopio is a former officer of the Bank. Procopio was Senior Vice President of Compliance and Loan

MORRIS LAW GROUP · 900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101 · 702/474-9400 · FAX 702/474-9422

Operations/Loan Administration from on or about October 2004, until December 2006, when he resigned.  Procopio was a member of the Loan Committee from on or about January 2005 to December 2006.  Based on information and belief, Procopio currently resides in Lubbock, Texas.

## III.    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction for this action pursuant to 12 U.S.C. § 1811 et seq., 12 U.S.C. § 1819(b)(1) and (2), and 28 U.S.C. §§ 1331 and 1345.  The FDIC is a corporation organized and existing under the laws of the United States of America, and brings this action in its receivership capacity.  Actions to which the FDIC is a party are deemed to arise under the laws of the United States.  The FDIC, including in its capacity as Receiver, has the authority to sue and complain in any court of law, and is empowered to pursue claims held by the Bank, including its claims against the Defendants.  12 U.S.C. § 1819.

16.    This Court has personal jurisdiction over the Defendants, who at all relevant times conducted business in the State of Nevada.

17.    This Court also has personal jurisdiction over Kelly, Dervenis, and Procopio under the Nevada Long-Arm Statute, Nev. Rev. Stat. § 14.065, and in accordance with the Due Process Clause of the United States Constitution.  Kelly, Dervenis, and Procopio have sufficient contacts with the State of Nevada, the causes of action herein arose from acts committed by Kelly, Dervenis, and Procopio in Nevada, and those acts caused injury to the Bank in Nevada.  Consequently, the exercise of personal jurisdiction by this Court is proper and does not offend any traditional notions of fair play or substantial justice.  In addition, Procopio was a resident of and officed in the State of Nevada at all relevant times, and this Court has personal jurisdiction over him on that basis.

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because all or substantially all of the acts charged herein occurred in this District and the FDIC-R's claims arose in this District.

## IV.   FACTUAL BACKGROUND

19.     The Bank was chartered in April 2000, as an industrial loan company headquartered in Las Vegas, Nevada.  In September 2004, the Bank was acquired by Stampede Holdings, Inc. ("Stampede"), a closely held company of 41 private investors.  The Bank moved its headquarters from Las Vegas to Henderson, Nevada, in the fourth quarter of 2006.  After Stampede acquired the Bank, the Bank focused on the nationwide purchase of loan participations, particularly ADC loans to finance condominium and CRE construction projects in high-growth markets.  On February 27, 2009, NFID closed the Bank and the FDIC was appointed as Receiver of the Bank.

20.     During the relevant period, between December 2004 and December 2005, the Bank's percentage of ADC loan concentrations as a percentage of total capital, grew from 17 percent to 136 percent, and by December 2006, it was 306 percent, which was more than three timesthe Bank's peer group average.

### A.     The Bank's Lending Function

21.     Loan underwriting practices are the primary determinant of bank credit risk and bank credit availability, and one of the most critical aspects of loan portfolio management.  Loan underwriting standards are also important in protecting bank capital, which can erode from unsafe and unsound lending practices.

22.     Underwriting practices generally can be characterized by the criteria used to qualify borrowers, loan pricing, repayment terms, sources of repayment, and collateral requirements.  Underwriting practices also encompass the management and administration of the loan portfolio,

including its growth, concentrations in specific markets or categories of lending, written lending policies, and adherence to written underwriting policies.

23.     Commercial real estate ("CRE") and acquisition, development, and construction ("ADC") loans are known to be more speculative than other types of loans because of, among other reasons, the lack of present cash flow source, uncertainties of development and sale, and the need for adequate, secondary sources of repayment.  Prudent lending in this segment of banking requires sound underwriting, timely evaluation and response to economic trends impacting the industry, and strict adherence to prudent lending policies and standards.  Moreover, concentrating a loan portfolio in CRE/ADC loans increases a bank's risk for numerous reasons, including  concentration in any sector of the economy increases risk resulting from that sector's  downturn; the housing market in particular, is cyclical by nature; the primary source of repayment is cash flow from the sale of the real estate collateral; and, historically, bank failure rates closely correlate with high CRE/ADC concentrations. Concentrations of CRE/ADC loans in volatile commercial real estate markets render a bank vulnerable to changes in market conditions and require vigilant adherence to  sound lending practices.  It is necessary that the known risks inherent in such high loan concentrations be managed by, at a minimum, management oversight, strategic planning, underwriting, risk assessment, and monitoring a CRE/ADC loan, portfolio risk management, market analysis, and stress testing.

24.     Regulatory agencies periodically reminded financial institutions of the risks involved in CRE/ADC lending.  On October 8, 1998, the FDIC issued Financial Institution Letter 110-98, which warned financial institutions of the risk inherent in ADC lending in a favorable real

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

estate market, including an over-supply of developed property. Among other things, FIL 110-98 stated that: "ADC lending is a highly specialized field with inherent risks that must be managed and controlled to ensure that this activity remains profitable." On December 12, 2006, the OCC, FDIC, and Board of Governors of the Federal Reserve System jointly issued "Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices," which specifically warned banks that: "[c]oncentrations of credit exposure add a dimension of risk that compound the risk inherent in individual loans."

### B.    The Bank's Loan Policy

25.    Throughout the period relevant to the FDIC-R's claims, the Bank's Loan Policy provided guidelines and requirements for underwriting, recommending the approval of, and approving loans. Among other things, the Loan Policy established loan documentation requirements, underwriting standards, loan-to-value ("LTV") ratios, characteristics of desirable and undesirable loans, and appraisal requirements. The Loan Policy also required that the Bank comply with FDIC rules and regulations. For real estate development loans, including loan participations, the Loan Policy required a study explaining the effect of property improvements on the market value of the land and a realistic consideration of the finished project's marketability in favorable and unfavorable market conditions.

26.    The Loan Policy requirements were established to ensure that each loan made had a strong likelihood of repayment. For example, documentation and analysis of the overall financial capability and resources of the borrowers and guarantors help approvers ensure loans have adequate secondary sources of repayment. Analysis of the collateral, including entitlements and appraisal requirements, are necessary to ensure

9

the adequate collateralization of loans, project feasibility, and timely repayment.

27.     The Bank's Loan Standards and Administration Policy ("Loan Standards") applied to loan participations, and stated that the Bank's underwriting practices shall: "provide for consideration, prior to commitment, of the borrower's overall financial condition and resources, the financial responsibility of any guarantor, the nature and value of any underlying collateral, and the borrower's character and willingness to repay as agreed."

28.     The Loan Standards required that the Bank's loan officers perform due diligence and that construction loans have documentation showing takeout commitments.  The Loan Standards provided: "proposals to finance speculative housing will be based on the prospective borrower's reputation, experience, and financial condition.  The finished projects' marketability in favorable and unfavorable market conditions shall be realistically considered."  The Loan Standards required guarantees who could guarantee the existing and future indebtedness of the borrower.  Under the Loan Standards, prudent underwriting practices required consideration, prior to credit commitment, of the borrower's overall financial condition and resources, the financial responsibility of any guarantor, the nature and value of any underlying collateral, and the borrower's character and willingness to repay as agreed.

*Requirements for Loan Participations*

29.     A loan participation is one in which two or more lenders share in the funding of a loan to mitigate their risk related to the lending relationship.  In a loan participation, one lender takes a role as lead servicer, typically controlling loan monitoring and having final decision-making authority not extended to the other participant lenders.  In return,

the lead lender receives a servicing fee. The lead lender will provide other potential participating financial institutions with an underwriting package, but sound banking practices require the participant banks to perform their own independent underwriting before participating in the funding of the loan.

30. The Bank's loan policy was consistent with this sound banking practice, requiring the Bank to conduct independent underwriting. Bank personnel who were involved in the lending process were to collect and analyze documentation in support of proposed loan participations, including, but not limited to, the following with respect to the participation arrangement:

    a.     Full credit information on the obligor during the life of the participation;

    b.     Any non-financial information that could help determine the quality of a loan;

    c.     Any violations of loan covenants by the obligor; and

    d.     Updates in property performance, and any known changes in property value.

31. The Loan Policy required the Bank to make a "prudent credit decision" based, in part, on performance of an independent credit analysis of credit quality and of the borrower and guarantor. That independent credit analysis required that the Bank personnel collect and analyze documentation in support of the loan, including but not limited to, the following:

    a.     A statement of the purposes of the loan and the planned repayment schedule for the loan;

    b.     An explanation of the disposition of the loan proceeds;

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

11

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

    c.    Financial statements of the borrower, including a statement of the frequency with which financial statements are to be provided by the borrower; and

    d.    Credit reports relating to the borrower.

32.    The Loan Policy also required the Bank personnel who were involved in the lending process to ensure that the Bank's loan participations were approved as part of a prudent credit decision, including, but not limited to, the following:

    a.    Reviewing the loan documentation;

    b.    Performing an independent analysis of credit quality;

    c.    Performing an analysis of the borrower and guarantors;

    d.    Performing an independent review of the appraisal;

    e.    Analyzing the property operating performance; and

    f.    Performing a property site inspection when warranted.

33.    The Loan Policy's requirement for an analysis of credit quality included, but was not limited to, the following:

    a.    The overall financial condition and resources, the financial responsibility of any guarantor, the nature and value of any underlying collateral, and the borrower's character and willingness to repay as agreed; and

    b.    A financial analysis, including collateral value and cash flows.

34.    The Loan Standards applied to participation loans and loan purchases, and provided that the required analysis and information

for such loans should be similar as that which would have been required had the loan been made directly by the Bank. The Loan Standards further provided that each such participation loan or loan purchase acquisition decision will be independently reached following an appropriate analysis to the same extent as if the loan had been made directly by the Bank.

*Loan Approval Structure and Limits*

35. Prior to May 2006, the Bank Delegations of Authority Policy required joint approvals by Jones and Dervenis, followed by Loan Committee approval, for loans of $1.5 million or greater. In May 2006 until at least November 2006, the Bank Delegations of Authority Policy required joint approvals by Jones and Dervenis, followed by Loan Committee approval, for loans of $3 million or greater.

36. During the relevant period, Defendants were members of the Loan Committee.

37. Under the Loan Policy, the Loan Committee was responsible for reviewing and approving loans and loan participations acquired by the Bank. For loans and loan participations requiring Loan Committee approval, the Loan Committee was presented with a Commercial Loan Underwriting Memorandum ("Underwriting Memorandum"), which provided a summary of the loan participation, description of collateral values, underwriter recommendations on loan approval, and other matters. In evaluating potential loans, the Loan Committee depended on the Underwriting Memorandum to contain accurate information and full disclosure, and depended on the Defendants to provide all relevant information and to respond accurately and with full disclosure when addressing questions from the Loan Committee.

13

MORRIS LAW GROUP · 900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

*Recognition of Risks*

38.     At the outset, a Business Plan for the Bank was prepared in April, 2004 ("Business Plan").  Upon information and belief, FDIC-R alleges that the Business Plan was prepared by or on behalf of Defendants Jones and Dervenis.  The Business Plan recognized that there were risks involved in the product strategy for the Bank, and stated that the Bank would employ superior, in-house credit and underwriting capabilities.  The Business Plan stated that the Bank would closely monitor the economic and other conditions of the states in which the collateral securing the loans is located.  The Business Plan also provided that prior to acquiring a loan, the Bank's in-house acquisition group will conduct a comprehensive due diligence evaluation consistent with the Bank's approved credit policy for purchasing loans.

39.     As early as October, 2005, Defendants Jones and Dervenis recognized the risks to the Bank from their CRE/ADC participation loan activities.  In a "Business Overview," they wrote:

- "**We may experience rapid growth in the future that could strain our limited resources.**  We are thinly staffed.  Our failure to effectively manage such growth could adversely affect our ability to earn profits.  We are dependent on key individuals and on our continued ability to attract experienced personnel. . . . "

- "**Our business model contains inherent risk because we rely on third-party information in making lending decisions.**  We buy loan participations that other banks originate and we fund loans other banks cannot fully fund due to their lending limits.  As part of this process, we often rely on information provided to us by independent, third-party banks that are more familiar than we are with the markets in which the loans are originated.  If such third-party information is incomplete

14

or inaccurate, or if we fail to adequately review such information, we may fail to realize risks in the loans we make, which could adversely affect our credit quality, resulting in a reduced ability to earn profits."

- **"Our business is subject to the success of the local economies where we operate.** Adverse economic conditions in our specific market areas could reduce our growth rate, affect the ability of our customers to repay their loans to us, and generally affect our financial condition and results of operations. Moreover, we cannot give any assurance that we will benefit from any market growth or favorable economic conditions in our primary market areas if they do occur. Adverse market or economic conditions in any of the local communities where we operate may disproportionately increase the risk that our borrowers will be unable to make their loan payments. An economic downturn could cause our interest income and net interest margin to decrease and our loan loss provision to increase, resulting in losses that materially adversely affect our business, financial condition, results of operations and cash flows. Additionally, the market value of the real estate securing loans as collateral could be adversely affected by unfavorable changes in market and economic conditions."

**C.     The Defendants' Grossly Negligent Acts and Breaches of Fiduciary Duties**

40.     As officers and/or directors of the Bank, the Defendants had duties to follow the Bank's Loan Policy and to exercise due care in underwriting, recommending, and approving loans and loan participations.

41.     Between October 2005 and October 2006, the Defendants breached their duties by causing the Bank to approve and fund loan participations that would not have been made had the Defendants

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

complied with the Bank's Loan Policy, followed prudent, safe, and sound lending practices, and conducted the required due diligence, including undertaking basic loan review procedures.

42.     The Defendants recommended and approved loans through their gross negligence and breaches of fiduciary duties in, among other things:

  a. Failing to conduct an independent credit analysis of each loan participation as required by the Loan Policy;

  b. Failing to conduct appropriate analyses of borrower and guarantor financial condition, resources, and responsibility as required by the Loan Policy, including failing to forecast and account for deficient borrower and guarantor liquidity, income, or project equity.

  c. Relying on outdated and unverified financial information from borrowers and guarantors;

  d. Failing to conduct appropriate analyses of the sources of repayment, such as failing to analyze viability of construction or take-out financing or the likelihood of lot sales for ADC projects;

  e. Failing to conduct appropriate analyses of the nature and value of collateral, such as failing to analyze local market conditions or zoning, permitting, or municipal approval requirements;

  f. Failing to conduct appropriate appraisal review, such failing to analyze extraordinary assumptions; and

16

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

        g.     Withholding information from the Loan Committee on serious deficiencies or exaggerating attributes for the Loan Committee relating to the collateral, borrower, or guarantor.

43.    These repeated violations of the Bank's Loan Policy and prudent, safe, and sound lending practices occurred throughout the lending process.  The Defendants who engaged in underwriting and recommending loan participations to the Loan Committee that caused damages to the Bank were grossly negligent and breached their fiduciary duties by, for example, recommending the approval of deficient loan participations and failing to provide the required information and analysis to support their recommendations.  The Defendants who recommended and provided information to the Loan Committee, and approved these loan participations were grossly negligent and breached their fiduciary duties by, for example, withholding information from the Loan Committee on serious deficiencies or exaggerating attributes to the Loan Committee relating to collateral, borrowers, or guarantors, failing to request missing information, failing to heed known "red flags," and failing to reject the loan participations when there were obvious, facial deficiencies.

44.    But for the Defendants' wrongful conduct, the Bank would not have approved the Loan Transactions that caused the Bank to suffer over $13.1 million in damages.

*Winchester Properties*

        a.     On or about October 11, 2005, the Loan Committee, including Jones, Dervenis, and Procopio, approved two participation interests for Winchester Properties, LLC, and Winchester Country Club, LLC.  The first was a $100,000 participation in a

17

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

$66.4 million senior ADC loan, and the second was a $3.4 million participation in a $4.8 million mezzanine ADC loan (unless referred to separately, the "Winchester loans").  A mezzanine loan is debt subordinated to other debt issued to the same borrower, meaning that it is junior to other loans with regard to claims on assets or earnings.  In the real estate development context, mezzanine loans are generally used as supplementary financing when the collateral is already security for a senior loan.  Marshall Bank, N.A. ("Marshall") was the lead lender.  The Bank's $3.4 million participation in the mezzanine loan was subject to a subordination agreement.  Under the subordination agreement, in the event that Marshall declared that the loan had defaulted, the Bank was not entitled to additional payments on its mezzanine loan until the senior loan was paid in full.

45.    On or about October 31, 2005, the Bank initially funded the Winchester mezzanine loan in the amount of $2,992,000.  On or about November 2, 2005, the Bank initially funded the Winchester senior loan in the amount of $90,555.  Between October 2005 and November 2007, the Bank disbursed approximately $83,825 on the Winchester senior loan and disbursed approximately $3,400,000 on the Winchester mezzanine loan.

46.    The purposes of the Winchester loans were to enable Winchester Properties, LLC and Winchester Country Club, LLC to refinance existing loans in order to complete infrastructure improvements on residential lots, establish an interest reserve, and to fund closing and

18

soft costs.  The residential lots were located in Meadow Vista, California, which is approximately 35 to 45 miles outside of Sacramento, California.

47.     According to the Underwriting Memoranda for the Winchester loans, the repayment sources were to be proceeds from the sale of lots, recovery of proceeds from collateral foreclosures, and the personal guarantors' net worth, in that order.  The Underwriting Memorandum for the mezzanine Winchester loan also lists proceeds from the sale of the country club as a primary repayment source.

48.     By taking the $3.4 million participation on the $4.8 million mezzanine loan, the Defendants put the Bank in a subordinate position in connection with the collateral.  The Bank's $100,000 interest in the Winchester senior loan was secured by: (1) a first mortgage on 161 unsold or to be developed lots in phase III and phase IV of the Winchester project, the golf course, and all improvements; (2) country club memberships and assignment of the golf court management contract; (3) a first mortgage on all tangible and intangible personal property located on or used in connection with the Winchester project or its development; and (4) an assignment of sale contracts and other agreements.  In contrast, the Bank's much larger interest in the Winchester mezzanine loan was secured only by a *second* mortgage on 161 unsold or to be developed lots in phase III and phase IV of the Winchester project, the golf course, club house, and all improvements.

49.     Procopio recommended, and Jones, Dervenis, and Procopio approved the Winchester loans through their gross negligence and breaches of fiduciary duties, which included, among other deficiencies, the following.

a.     The Winchester borrowers and guarantors had deficient financial resources.  The combined

19

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101

702/474-9400 • FAX 702/474-9422

borrower and guarantor liquidity was reported to be only approximately $1,574,571, which equaled 2.2 percent of the combined Winchester loans.  In addition, 2004 tax returns for the principal guarantors showed negative $3,621,978 adjusted gross income and $3,136,696 in rental real estate and other losses.

b.    Jones, Dervenis, and Procopio failed to verify and document, as required, financial information from the borrowers or guarantors.

c.    Jones, Dervenis, and Procopio failed to conduct the required analysis of the likelihood of lot sales or factors underlying those lot sales even though the Underwriting Memoranda listed lot sales as the primary repayment source.

d.    Jones, Dervenis, and Procopio failed to provide the required analysis of market conditions relevant to the Winchester project.  On September 19, 2005, which is less than a month before the Loan Committee approved the Winchester loans, Dervenis wrote to Jones and Procopio, "I know nothing about the Sacramento market, this could be an ideal spot or a dog, don't know."

e.    Jones, Dervenis, and Procopio failed to provide the required analysis of the collateral appraisal.  The Marshall participation prospectus estimated an average sale price of $716,864 for each unit at the end of a three-year loan term in 2008 with a

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

$573,491 release price.  Conversely, the Marshall prospectus further stated that of the 27 units in the Winchester development sold in 2005, sale prices ranged from $310,000 to $585,000 with an average sale price of $419,226.  The difference between the 2005 $419,226 average sale price and the $716,838 estimated future sale price is $297,638, which is 71 percent over the 2005 average sale price.  The difference between the 2005 $419,226 average sale price and the $573,491 future release price is $154,265, which is 37 percent over the 2005 average sale price.

      f.     In summary, Procopio failed to independently underwrite the loan.  Indeed, he copied material portions of the Winchester Underwriting Memoranda from the Marshall participation prospectus, including portions relating to the developer's background, loan strengths and weaknesses, and other material topics.

    50.    Jones, Dervenis, and Procopio were grossly negligent and breached their fiduciary duties when they withheld from or provided exaggerated information to the Loan Committee in recommending or approving the Winchester loans, including, but not limited to, the following.

      a.     Jones, Dervenis, and Procopio failed to disclose to the Loan Committee their failure to perform the required independent credit analysis of the Winchester loans.

b.   Jones, Dervenis, and Procopio failed to disclose to the Loan Committee their failure to verify, as required, the borrowers' and guarantors' financial information.

c.   Jones, Dervenis, and Procopio failed to disclose to the Loan Committee their failure to perform the required analysis of repayment sources, including the likelihood of lot sales.

d.   Jones, Dervenis, and Procopio failed to inform the Loan Committee of Dervenis's expressed ignorance as to whether the market for the Winchester project could be "an ideal spot or a dog."  Instead, the Defendants described market conditions positively in the Underwriting Memoranda, including the following, which Procopio copied from the Marshall prospectus: "Although there are some short-term concerns, including the state government budget crises and declining affordability, the long-term outlook for the Sacramento region remains positive."

e.   Jones, Dervenis, and Procopio withheld from the Loan Committee "red flags" in the Marshall prospectus as to the collateral appraisal for estimated future sale values.

51.   Based on Procopio's recommendation, the Loan Committee, including Jones, Dervenis, and Procopio, approved the Winchester loans on or about October 11, 2005.  Jones, Dervenis, and Procopio voted to approve the Winchester loans even though underwriting

22

and credit analysis was deficient, the Defendants withheld material information from the Loan Committee, and the Defendants exaggerated information provided to the Loan Committee in violation of the Loan Policy.  The required underwriting would have demonstrated that the guarantors' liquidity and income did not support the loan amount, that repayment sources were vulnerable to a softening housing market, among other issues, and that the Winchester loans should not have been approved.

52.     The acts and omissions of the Defendants violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices. The Defendants were grossly negligent and breached their fiduciary duties by recommending or approving the Winchester loans without performing the required due diligence and underwriting and by withholding from or providing exaggerated information to the Loan Committee.

53.     On or about January 2007, Winchester Properties, LLC and Winchester Country Club, LLC defaulted on the Winchester senior loan.  On or about November 2007, Winchester Properties, LLC and Winchester Country Club, LLC defaulted on the Winchester mezzanine loan.

54.     Defendants' grossly negligent actions and inactions and breaches of fiduciary duties with respect to the Winchester loans caused damages in excess of $3.6 million.   Had the Defendants performed the required due diligence, performed the required credit analysis, provided complete and accurate information to the Loan Committee, and otherwise complied with the Bank's Loan Policy, the Bank would not have extended these loan participations to Winchester Properties, LLC and Winchester Country Club, LLC and incurred the resulting damages.

*WSG Key West*

55.     On or about November 30, 2005, the Loan Committee, including Jones, Dervenis, and Procopio, approved a $1.55 million participation in a $3 million mezzanine ADC loan for WSG Key West, LLC (the "WSG Key West loan").  Marshall was the lead lender.  The Bank's interest in the $3 million mezzanine loan was subject to a subordination agreement.  Under the subordination agreement, in the event that Marshall declared that the loan had defaulted, the Bank was not entitled to additional payments on its interest in the mezzanine loan until the interest holders in the senior debt were paid in full, placing the Bank in much riskier position than the senior debt holders.  Between December 2005 and February 2008, the Bank disbursed approximately $1,513,160 on its participation interest in the WSG Key West loan.

56.     The purpose of the WSG Key West loan was to enable WSG Key West, LLC, to acquire property in Stock Island Key, Monroe County, Florida, for a resort development project.

57.     According to the WSG Key West Underwriting Memorandum, the repayment sources were to be the proceeds from a vertical construction loan, proceeds from sale of existing marina slips, proceeds from sale of the property as is, and proceeds from conversion of the guarantors' assets, in that order.

58.     The WSG Key West loan was secured by a first mortgage lien on the WSG Key West property, assignment of leases, rents, and other contracts, and a security interest in all tangible and intangible personal property located on or used in connection with the WSG Key West project and its development.

59.     Jones and Procopio recommended, and Jones, Dervenis, and Procopio approved, the WSG Key West loan through their gross

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

negligence and breaches of fiduciary duties, which included, among other deficiencies, the following.

    a.    Jones, Dervenis, and Procopio failed to provide the required analysis of the guarantors' creditworthiness, including an analysis of contingent liabilities, liquidity, cash flow, or other material issues.

    b.    Jones, Dervenis, and Procopio failed to verify and document,, as required, financial information from the borrower or the guarantors.

    c.    Jones, Dervenis, and Procopio failed to conduct the required analysis of the likelihood of a vertical construction loan even though the Underwriting Memorandum listed a vertical construction loan as the primary repayment source.

    d.    Jones, Dervenis, and Procopio failed to provide the required analysis of market conditions relevant to the WSG Key West project, including the status of permitting requirements.  The WSG Key West project required additional permitting to complete construction, and Monroe County had imposed a building moratorium, which included the WSG Key West project property.

    e.    Jones, Dervenis, and Procopio failed to obtain and review a final appraisal prior to the Loan Committee's approval of the WSG Key West loan.

    f.    According to an appraisal prepared two years after the Loan Committee approved the WSG Key West

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

loan, the only "potential use, i.e., legally allowable use, at this time is a commercial marina catering to the fishing industry."  The appraisal continues, stating, "it could take anywhere from a year to several years to obtain the necessary approvals and permits to begin residential and/or mixed use construction on the site with no existing units in place. . . .  The developer is anticipating a one year period to obtain the remaining necessary approvals to develop the marina portion of the project."

g.   In summary, Jones and Procopio failed to independently underwrite the loan.  Indeed, they copied material portions of the WSG Key West Underwriting Memorandum from the Marshall participation prospectus, including portions relating to the developer's background, loan strengths and weaknesses, and other material topics.

60.   Jones, Dervenis, and Procopio were grossly negligent and breached their fiduciary duties when they withheld from or provided exaggerated information to the Loan Committee in recommending or approving the WSG Key West loan, including, but not limited to, the following.

a.   Jones, Dervenis, and Procopio failed to disclose to the Loan Committee their failure to perform the required independent credit analysis of the WSG Key West loan.

26

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

b.   Jones, Dervenis, and Procopio failed to disclose to the Loan Committee their failure to verify, as required, the borrower and guarantors' financial information.  The Underwriting Memorandum provided to the Loan Committee stated only: "They are very experienced at high profile, water resort condo developments[,]" and provided financial information for the guarantors copied from the Marshall prospectus.

c.   Jones, Dervenis, and Procopio failed to disclose to the Loan Committee their failure to perform the required analysis of repayment sources, including the likelihood of a vertical construction loan.

d.   Jones, Dervenis, and Procopio failed to inform the Loan Committee of the extent of the WSG Key West project's permitting barriers.  Although the Underwriting Memorandum provided to the Loan Committee acknowledged approval issues as a "weakness," the Underwriting Memorandum ultimately dismisses permitting approval issues, stating: "[t]he moratorium is due primarily to the evaluation of environmentally sensitive areas.  This particular property has been designated as a low environmental concern."  Two years after Jones, Dervenis, and Procopio recommended and approved the WSG Key West loan the only "legally allowable use" was as a "commercial marina."  Exercising even a slight degree of care by

27

conducting the required due diligence would have shown that obtaining the necessary permits would potentially take years to complete.

61.     Based on Jones and Procopio's recommendation, the Loan Committee, including Jones, Dervenis, and Procopio, approved the WSG Key West loan on or about November 30, 2005.  Jones, Dervenis, and Procopio voted to approve the WSG Key West loan even though underwriting and credit analysis was deficient, the Defendants withheld information from the Loan Committee, and the Defendants exaggerated information provided to the Loan Committee in violation of the Loan Policy.  The required underwriting would have demonstrated the extent of permitting challenges, the poor likelihood of securing vertical construction financing in light of those challenges, among other issues, and that the WSG Key West loan should not have been approved.

62.     The acts and omissions of the Defendants violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices. The Defendants were grossly negligent and breached their fiduciary duties by recommending or approving the WSG Key West loan without performing the required due diligence and underwriting and by withholding from or providing exaggerated information to the Loan Committee.

63.     On or about February 2008, WSG Key West, LLC defaulted on the WSG Key West loan.

64.     Defendants' grossly negligent actions and inactions and breaches of fiduciary duties with respect to the WSG Key West loan caused damages in excess of $830,000.   Had the Defendants performed the required due diligence, performed the required credit analysis, provided true and accurate information to the Loan Committee, and otherwise

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

complied with the Bank's Loan Policy, the Bank would not have extended this loan participation to WSG Key West, LLC and incurred the resulting damages.

*Winners, LLC (a.k.a., Beach House)*

65.     On or about February 10, 2006, the Loan Committee, including Jones, Dervenis, and Procopio, approved a $5 million participation in a $35,630,000 senior ADC loan for Winners, LLC (the "Winners, LLC loan").  Marshall was the lead lender.  On or about February 23, 2006, the Bank initially funded its participation interest in the Winners, LLC loan in the amount of $3,708,343.  Between February 2006 and December 2007, the Bank disbursed approximately $4,839,200 on its participation interest in the Winners, LLC loan.

66.     The purpose of the Winners, LLC loan was to enable Winners, LLC to refinance existing debt and to fund predevelopment costs for resort property in Surfside, Florida.

67.     According to the Winners, LLC Underwriting Memorandum, the repayment sources were to be proceeds from a construction loan, recovery of proceeds from collateral foreclosure, and the guarantors' net worth and liquidity, in that order.

68.     The Winners, LLC loan was secured by a first lien on the project property and assignment of cash flow from hotel operations.

69.     Dervenis and Procopio recommended, and Jones, Dervenis, and Procopio approved the Winners, LLC loan through their gross negligence and breaches of fiduciary duties, which included, among other deficiencies, the following.

a.     Jones, Dervenis, and Procopio failed to provide the required analysis of the guarantors' creditworthiness even though the guarantors' net

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101

702/474-9400 • FAX 702/474-9422

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

worth was comprised primarily of real estate holdings and the guarantors had limited liquidity. On December 17, 2005, Jones wrote in correspondence to Dervenis and Procopio, "Are we comfortable with the development team – not much experience in developing projects."

b.    Jones, Dervenis, and Procopio failed to verify and document, , as required, financial information from the borrower or the guarantors.

c.    Jones, Dervenis, and Procopio failed to provide the required analysis of the likelihood of a construction loan even though the Underwriting Memorandum listed the proceeds of a construction loan as the primary repayment source.

d.    Jones, Dervenis, and Procopio failed to provide the required analysis of market conditions relevant to the Winners, LLC project, including collateral value and permitting requirements.  On December 17, 2005, Jones wrote to Dervenis, "Basically the value doubled in one year?  This is ridiculous."  Dervenis replied, "All of Florida is ridiculous.  This alone with no other information would scare me."

e.    Jones, Dervenis, and Procopio failed to provide the required analysis of the collateral appraisal, including the timeline for building permits.  In fact, building permits were not available until September 2007, more than a year after the Loan Committee approved the Winners, LLC loan.

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101

702/474-9400 • FAX 702/474-9422

f.    In summary, Dervenis and Procopio failed to independently underwrite the loan.  Indeed, they copied material portions of the Winners, LLC Underwriting Memorandum from the Marshall participation prospectus, including portions relating to the developer's background, loan strengths and weaknesses, and other material topics.

70.    Jones, Dervenis, and Procopio were grossly negligent and breached their fiduciary duties when they withheld from or provided exaggerated information to the Loan Committee in recommending or approving the Winners, LLC loan, including, but not limited to, the following.

a.    Jones, Dervenis, and Procopio failed to disclose to the Loan Committee their failure to perform the required independent credit analysis of the Winners, LLC loan.

b.    Jones, Dervenis, and Procopio failed to disclose to the Loan Committee their failure to verify, as required, the borrower and guarantors' financial information.

c.    Jones, Dervenis, and Procopio failed to disclose to the Loan Committee their failure to perform the required analysis of repayment sources, including the likelihood of proceeds from a construction loan.

d.    Jones, Dervenis, and Procopio failed to inform the Loan Committee about expressed reservations as to the local real estate market.  Instead of conveying

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101

702/474-9400 · FAX 702/474-9422

Dervenis's sentiment that "All of Florida is ridiculous," the Underwriting Memorandum stated, "While the once hot investor market has cooled, demand by end users with accumulated wealth is expected to continue.  We believe the subject property fits this profile."  In addition, the Defendants described building permits for the project as a foregone conclusion, stating: "the project has been fully approved by the town of Surfside."  The project did not receive the required permits to begin construction until more than a year after the Loan Committee approved the Winners, LLC loan.

e.      Jones, Dervenis, and Procopio failed to disclose to the Loan Committee their failure to perform the required analysis of the collateral appraisal, including the timeline for securing building permits.

71.     Based on Dervenis and Procopio's recommendation, the Loan Committee, including Jones, Dervenis, and Procopio, approved the Winners, LLC loan on or about February 10, 2006.  Jones, Dervenis, and Procopio voted to approve the Winners, LLC loan even though underwriting and credit analysis was deficient, the Defendants withheld material information from the Loan Committee, and the Defendants exaggerated information provided to the Loan Committee in violation of the Loan Policy.  The required underwriting would have demonstrated the extent of permitting challenges, the poor likelihood of securing

construction financing in light of those challenges, among other issues, and that the Winners, LLC loan should not have been approved.

72.     The acts and omissions of the Defendants violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices. The Defendants were grossly negligent and breached their fiduciary duties by recommending or approving the Winners, LLC loan without performing the required due diligence and underwriting and by withholding from or providing exaggerated information to the Loan Committee.  On or about December 2007, Winners, LLC defaulted on the Winners, LLC loan.

73.     Defendants' grossly negligent actions and inactions and breaches of fiduciary duties with respect to the Winners LLC loan caused damages of approximately $2,066,055.  Had the Defendants performed the required due diligence, performed the required credit analysis, provided complete and accurate information to the Loan Committee, and otherwise complied with the Bank's Loan Policy, the Bank would not have extended this loan participation to Winners, LLC and incurred the resulting damages.

*Corinthian Communities*

74.     On or about June 20, 2006, the Loan Committee, including Jones, Dervenis, and Procopio, approved a $3 million participation in a $19,040,000 ADC loan for Corinthian Communities, Inc. (the "Corinthian loan").  Marshall was the lead lender.  On or about June 27, 2006, the Bank initially funded its participation interest in the Corinthian loan for the amount of $1,658,476.  Between June 2006 and December 2008, the Bank disbursed approximately $2,089,427 on its participation interest in the Corinthian loan.

75.     The purpose of the Corinthian loan was to enable Corinthian Communities, Inc. to acquire a 127-acre parcel of vacant land near Star, Idaho, for a planned residential community.

76.     According to the Corinthian Underwriting Memorandum, the repayment sources were to be proceeds from a construction loan from Marshall, proceeds from conversion of the guarantors' assets, and proceeds from the bulk sale of collateral, in that order.

77.     The Corinthian loan was secured by a first deed of trust on the project property.

78.     Dervenis and Procopio recommended, and Jones, Dervenis, and Procopio approved, the Corinthian loan through their gross negligence and breaches of fiduciary duties, which included, among other deficiencies, the following.

   a.     Jones, Dervenis, and Procopio failed to provide the required analysis of the guarantors' creditworthiness even though that the guarantors' liquidity was approximately 7/100th of 1 percent (0.07%) of the guarantors' net worth and 1.58 percent of the overall Corinthian loan amount.  On May 30, 2006, Dervenis wrote to Procopio, "How in the world can you have 400+mm net worth and $200k in liquidity?"

   b.     Jones, Dervenis, and Procopio failed to verify and document, as required, financial information from the borrower or guarantors.  Jones, Dervenis, and Procopio also relied on outdated financial information.  Tax returns of the guarantors that

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

were available when the Defendants recommended or approved the Corinthian loan in June 2006 were for 2003 and 2004, but not 2005. Unaudited financial statements were also listed as of June 2005 and December 2005.

c.    Jones, Dervenis, and Procopio failed to provide the required analysis of the likelihood of a construction loan even though the Underwriting Memorandum listed "Construction loan by Marshall BankFirst" as the primary repayment source.

d.    Jones, Dervenis, and Procopio failed to provide the required analysis of market conditions relevant to the Corinthian project, including "red flags" and building approvals. The purchase agreement and other documents suggested a non-arms' length relationship between the buyer and seller that resulted in an inflated purchase price for the Corinthian property. The Defendants also failed to consider the timing relating to building approvals. The Underwriting Memorandum that Dervenis and Procopio prepared for the Loan Committee stated that the subdivision had "preliminary plat map approval" "which allows the development as planned." However, preliminary approval still required subsequent approvals, which would ultimately delay project development by more than a year.

e.     Jones, Dervenis, and Procopio failed to provide the required analysis of the collateral appraisal, including the timeline for building approvals.

f.     In summary, Dervenis and Procopio failed to independently underwrite the loan.  Indeed, they copied material portions of the Corinthian Underwriting Memoranda from the Marshall participation prospectus, including portions relating to the developer's background, loan strengths and weaknesses, and other material topics.

79.     Jones, Dervenis, and Procopio were grossly negligent and breached their fiduciary duties when they withheld from or provided exaggerated information to the Loan Committee in recommending or approving the Corinthian loan, including, but not limited to, the following.

a.     Jones, Dervenis, and Procopio failed to disclose to the Loan Committee their failure to perform the required independent credit analysis of the Corinthian loan.

b.     Jones, Dervenis, and Procopio failed to disclose to the Loan Committee their failure to verify, as required, the borrower and guarantors' financial information.  The Corinthian Underwriting Memorandum provided to the Loan Committee offers only general information as to the guarantors' background and financial information even though the guarantors' liquidity was approximately 7/100th of 1 percent of the guarantors' net worth

36

and 1.58 percent of the overall Corinthian loan amount. Jones, Dervenis, and Procopio also failed to inform the Loan Committee of Dervenis's reservations as to the guarantors' liquidity, instead describing as a mitigating factor to the guarantors' low liquidity the guarantors' purported access to high corporate liquidity. However, the corporation at issue was not a formal guarantor and had no obligation to supply funds to the actual guarantors.

c.    Jones, Dervenis, and Procopio failed to disclose to the Loan Committee their failure to perform the required analysis of repayment sources, including the likelihood of a construction loan from Marshall.

d.    Jones, Dervenis, and Procopio failed to disclose to the Loan Committee the "red flags" associated with collateral value described above and that they exaggerated information relating to building approval.

e.    Jones, Dervenis, and Procopio failed to disclose to the Loan Committee their failure to perform the required analysis of the collateral appraisal.

80.    Based on Dervenis and Procopio's recommendation, the Loan Committee, including Jones, Dervenis, and Procopio, approved the Corinthian loan on or about June 20, 2006. Jones, Dervenis, and Procopio voted to approve the Corinthian loan even though underwriting and credit analysis was deficient, the Defendants withheld material information from the Loan Committee, and the Defendants exaggerated information provided to the Loan Committee in violation of the Loan Policy. The

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101

702/474-9400 • FAX 702/474-9422

required underwriting would have demonstrated the extent of the guarantors' poor liquidity, "red flags" as to risks of inflated collateral value, the poor likelihood of securing construction financing from Marshall in light of those challenges, among other issues, and that the Corinthian loan should not have been approved.

81.     The acts and omissions of the Defendants violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices. The Defendants were grossly negligent and breached their fiduciary duties by recommending or approving the Corinthian loan without performing the required due diligence and underwriting and by withholding from or providing exaggerated information to the Loan Committee.

82.     Defendants' grossly negligent actions and inactions and breaches of fiduciary duties with respect to the Corinthian loan caused damages in excess of $2.26 million.  Had the Defendants performed the required due diligence, performed the required credit analysis, provided complete and accurate information to the Loan Committee, and otherwise complied with the Bank's Loan Policy, the Bank would not have extended this loan participation to Corinthian Communities, Inc. and incurred the resulting damages.

*Northshore Center*

83.     On or about July 5, 2006, the Loan Committee, including Jones and Dervenis, approved a $5 million participation in a $26,210,000 ADC loan for Northshore Center THC, LLC (the "Northshore loan"). Marshall was the lead lender.  On or about July 10, 2006, the Bank initially funded its participation interest in the Northshore loan in the amount of $3,723,188.99.  Between July 2006 and June 2008, the Bank disbursed approximately $4,864,284 on its participation interest in the Northshore loan.

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101

702/474-9400 · FAX 702/474-9422

84.     The purpose of the Northshore loan was to enable Northshore Center THC, LLC to refinance existing debt and fund predevelopment site costs for a condominium and retail development project in Northbrook Village, Illinois.  Northbrook Village is a suburb of Chicago, Illinois.

85.     According to the Northshore Underwriting Memorandum, the repayment sources were to be proceeds from refinancing with "construction mini-perm" and proceeds from liquidation of the guarantors' personal assets, in that order.

86.     The Northshore loan was secured by a first mortgage on the Northshore project property and all improvements and assignment of sales contracts, earnest money deposits, and other amounts.

87.     Procopio recommended, and Jones and Dervenis approved, the Northshore loan through their gross negligence and breaches of fiduciary duties, which included, among other deficiencies, the following.

a.     Jones, Dervenis, and Procopio failed to provide the required analysis of the guarantors' creditworthiness even though the guarantors had negative adjusted gross income for the 2005 tax year, as well as a poor credit history.  Jones, Dervenis, and Procopio also failed to assess "red flags" relating to past credit history and financing, including, as described in the Underwriting Memorandum, that the borrower "was forced to finance the acquisition with an expensive hard money loan from a wealthy individual."

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

b.   Jones, Dervenis, and Procopio failed to verify and document, as required, financial information from the borrower or guarantors.  The Underwriting Memorandum that Procopio prepared for the Loan Committee offered only information copied from the Marshall prospectus or received from Marshall.  For example, as to a guarantor's credit score, the Underwriting Memorandum stated only, "Not that we are stating this is true, but [it] is the borrowers [sic] statement."  Jones, Dervenis, and Procopio failed to verify financial information despite the individual guarantors having negative adjusted gross income from between $33,445 and $141,257 and, in the case of a corporate guarantor, $2,212,970 in ordinary business losses for the 2005 tax year.

c.   Jones, Dervenis, and Procopio failed to provide the required analysis of the likelihood of a construction loan even though the Underwriting Memorandum listed the proceeds of a refinanced construction loan as the primary repayment source.

d.   Jones, Dervenis, and Procopio failed to provide the required analysis of market conditions relevant to the Northshore project, including zoning requirements.  Land and air rights and zoning approvals were necessary for project success and the Underwriting Memorandum describes them as a foregone conclusion.  The developers were never able to secure those land and air rights or the

40

necessary municipal approvals.  Jones, Dervenis, and Procopio also failed to evaluate, as required, local market conditions relating to pre-sold condominium units.  The Underwriting Memorandum makes numerous references to the pre-sale of 35 of the "up to 112" condominium units with "10% non-refundable deposits."  However, under Illinois law, those deposits were fully refundable.

e.  Jones, Dervenis, and Procopio failed to provide the required analysis of the collateral appraisal, including the land and air rights and zoning issues.  The appraisal stated that the final agreements for the land and air rights were preliminary.  The Underwriting Memorandum stated, however, that the borrower had obtained the land and air rights and indicated that zoning approvals were a foregone conclusion.

f.  In summary, Procopio failed to independently underwrite the loan.  Indeed, he copied material portions of the Northshore Underwriting Memoranda from the Marshall participation prospectus, including portions relating to the developer's background, loan strengths and weaknesses, and other material topics.

88.  Jones, Dervenis, and Procopio were grossly negligent and breached their fiduciary duties when they withheld from or provided exaggerated information to the Loan Committee in recommending or

41

approving the Northshore loan, including, but not limited to, the following.

    a.    Jones, Dervenis, and Procopio failed to disclose to the Loan Committee their failure to perform the required independent credit analysis of the Northshore loan.

    b.    Jones, Dervenis, and Procopio failed to disclose to the Loan Committee their failure to verify, as required, the borrower and guarantors' financial information.  Jones, Dervenis, and Procopio dismissed "red flags" as to the guarantors' creditworthiness, instead stating in the Underwriting Memorandum: "Highly desirable location!  Have to go to the three most important factors of Commercial Real Estate, location, location, location."

    c.    Jones, Dervenis, and Procopio failed to disclose to the Loan Committee their failure to perform the required analysis of repayment sources, including the likelihood of proceeds from a construction loan.

    d.    Jones, Dervenis, and Procopio exaggerated information to the Loan Committee as to local real estate market conditions and overstated the value of deposits on pre-sales, since those deposits were fully refundable.

    e.    Jones, Dervenis, and Procopio failed to disclose to the Loan Committee their failure to perform the required analysis of the collateral appraisal,

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

including misstating that the borrower had obtained the land and air rights and that zoning approvals were a foregone conclusion.

89.     Based on Procopio's recommendation, the Loan Committee, including Jones and Dervenis approved the Northshore loan on or about July 5, 2006.  Jones and Dervenis voted to approve the Northshore loan even though underwriting and credit analysis was deficient, the Defendants failed to provide complete and accurate information to the Loan Committee in violation of the Loan Policy.  The required underwriting would have demonstrated the extent of approval challenges, the poor likelihood of securing construction financing in light of those challenges, among other issues, and that the Northshore loan should not have been approved.

90.     The acts and omissions of the Defendants violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices. The Defendants were grossly negligent and breached their fiduciary duties by recommending or approving the Northshore loan without performing the required due diligence and underwriting and by withholding from or providing exaggerated information to the Loan Committee.

91.     Defendants' grossly negligent actions and inactions and breaches of fiduciary duties with respect to the Northshore loan caused damages in excess of $3.4 million.  Had the Defendants performed the required due diligence, performed the required credit analysis, provided complete and accurate information to the Loan Committee, and otherwise complied with the Bank's Loan Policy, the Bank would not have extended this loan participation to Northshore Center THC, LLC and incurred the resulting damages.

*Hisey, LLC*

92.    On or about October 4, 2006, the Loan Committee, including Jones, Dervenis, Procopio, approved a $3,748,500 participation in a $4,165,000 ADC loan for Hisey, LLC (the "Hisey, LLC loan").  First Mutual Bank was the lead lender.  On or about November 2006, the Loan Committee approved the Bank's acquisition of the remaining portion of the Hisey, LLC loan, increasing the Bank's total participation interest to $4,165,000.  On or about November 22, 2006, the Bank initially funded its participation interest in the Hisey, LLC loan in the amount of $635,315. Between November 2006 and October 2007, the Bank disbursed approximately $1,541,119 on its participation interest in the Hisey, LLC loan.

93.    The purpose of the Hisey, LLC loan was to enable Hisey, LLC to acquire and develop a residential community project near Lake Stevens, Washington.

94.    According to the Hisey Underwriting Memorandum, the repayment sources were to be proceeds from the sale of finished lots or funds from the guarantors' assets, in that order.

95.    The Hisey, LLC loan was secured by a first deed of trust on project property.

96.    Dervenis and Procopio recommended, and Jones, Dervenis, Procopio approved, the Hisey, LLC loan through their gross negligence and breaches of fiduciary duties, which included, among other deficiencies, the following.

        a.    Jones, Dervenis, and Procopio failed to provide the required analysis of the guarantors' creditworthiness even though the guarantors' net worth was principally comprised of unrealized gain

from incomplete real estate development projects.
Additionally, a large portion of the guarantors' net
worth was from earnest money deposits.  If the
development projects were not completed, the
earnest money deposits would have been returned
and the net worth attributed to the unrealized gain
would never have materialized.  A guarantor also
had $684,702 in gambling losses in 2005.

b.  Jones, Dervenis, and Procopio failed to verify and
document, as required, financial information from
the borrower or guarantors.  The guarantors' net
worth was principally comprised of unrealized gain
from incomplete real estate development projects
and earnest money deposits.  Defendants' failed to
conduct and document any analysis or verification
of these real estate holdings and projects.

c.  Jones, Dervenis, and Procopio failed to provide the
required analysis of the lot sales even though the
Underwriting Memorandum listed lot sales as the
primary repayment source.  Among other things,
Jones, Dervenis, and Procopio ignored red flags that
made clear that the finished lots were unlikely to
serve as a sufficient repayment source.  The
appraisal's "at completion" valuation assumed an
average lot price of $175,000."  On October 3, 2006,
Procopio wrote to Dervenis, "IF THE LOTS ARE
[$]175K VALUE AND ARE GOING TO BE SOLD
AROUND THAT PRICE TO A DEVELOPER, HOW

45

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

IN THE WORLD ARE THEY GOING TO SELL HOUSES AT THE [$]300K-400K LEVEL … BEFORE PROFIT MARGIN TO THE BUILDER YOU WILL BE OVER [$]400K. SOMETHING MUST BE WRONG"  Defendants failed to conduct any further analysis and failed to reveal this "red flag" in the Underwriting Memorandum.

d.  Jones, Dervenis, and Procopio failed to provide the required analysis of the extraordinary assumptions in the appraisal for the lots, including that the lot sales would occur by Spring 2007, and that lots would be completed and sold within six to eight months after the October 2006 loan approval.  In fact, the developer was not able to obtain *preliminary* plat approval until June 2007, much less finish building by that time.  As Procopio noted in the Hisey Appraisal Review Form, without these extraordinary assumptions, the LTV ratio was 236 percent, which far exceeded the 80 percent LTV ratio ceiling in the Bank's Loan Policy.

e.  In summary, Dervenis and Procopio failed to independently underwrite the loan.  Indeed, they copied material portions of the Hisey Underwriting Memoranda from the First Mutual Bank participation prospectus, including portions relating to the developer's background, loan strengths and weaknesses, and other material topics.

46

97.     Jones, Dervenis, and Procopio were grossly negligent and breached their fiduciary duties when they withheld from or provided exaggerated information to the Loan Committee in recommending or approving the Hisey, LLC loan, including, but not limited to, the following.

a.     Jones, Dervenis, and Procopio failed to disclose to the Loan Committee their failure to perform an the required independent credit analysis of the Hisey, LLC loan.

b.     Jones, Dervenis, and Procopio failed to disclose to the Loan Committee their failure to verify, as required, the borrower and guarantors' financial information.  Jones, Dervenis, and Procopio also withheld from the Loan Committee that the guarantors' net worth was principally comprised of unrealized gains from incomplete real estate projects and earnest money deposits.

c.     Jones, Dervenis, and Procopio failed to disclose to the Loan Committee their failure to perform the required analysis of repayment sources, including the likelihood of lot sales.

d.     Jones, Dervenis, and Procopio withheld information to the Loan Committee as to local real estate market conditions.  An average lot price of $175,000 was required to support the appraiser's valuation "at completion."  However, the $175,000 average lot price would have made it economically unfeasible to achieve the target median new home price of $344,990 described in the Underwriting

47

Memorandum.  Jones, Dervenis, and Procopio did not describe that "red flag" to the Loan Committee.

e.   Jones, Dervenis, and Procopio failed to disclose to the Loan Committee the extraordinary assumptions in the appraisal and their failure to perform the required analysis of the collateral appraisal.

98.   Based on Dervenis and Procopio's recommendation, the Loan Committee, including Jones, Dervenis, and Procopio, approved the Hisey, LLC loan on or about October 4, 2006.  Jones, Dervenis, and Procopio voted to approve the Hisey, LLC loan even though underwriting and credit analysis was deficient, the Defendants withheld material information form the Loan Committee, and the Defendants exaggerated information to the Loan Committee in violation of the Loan Policy.  The required underwriting would have demonstrated the extent of construction schedule challenges, among other issues, and that the Hisey, LLC loan should not have been approved.

99.   The acts and omissions of the Defendants violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices. The Defendants were grossly negligent and breached their fiduciary duties by recommending or approving the Hisey, LLC loan without performing the required due diligence and underwriting and by withholding from or providing exaggerated information to the Loan Committee.  On or about October 2007, Hisey, LLC defaulted on the Hisey, LLC loan.  Defendants' grossly negligent actions and inactions and breaches of fiduciary duties with respect to the Hisey LLC loan caused damages in excess of $900,000. Had the Defendants performed the required due diligence, performed the required credit analysis, provided complete and accurate information to the Loan Committee, and otherwise complied with the Bank's Loan Policy,

the Bank would not have extended this loan participation to Hisey, LLC and incurred the resulting damages.

## V.  CAUSES OF ACTION

### COUNT I – BREACH OF FIDUCIARY DUTIES
### (All Defendants)

100.   The FDIC-R re-alleges and incorporates by reference the allegations contained in paragraphs 1-82 above as if fully set out in this Count.

101.   As officers and directors of the Bank, at all times, the Defendants owed to the Bank fiduciary duties of care and loyalty, including duties of honesty, full disclosure, and the obligation to exercise their powers in good faith and with a view to the interests of the Bank.

102.   As part of their fiduciary duties, the Defendants had a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them, and to act with requisite care in the discharge of their duties.

103.   This duty included, among other things: conducting the business of the Bank in a manner consistent with safe and sound lending practices; using prudent procedures for underwriting, recommending approval of loans, and approving loans; underwriting, recommending approval of loans, and approving loans in accordance with the Bank's Loan Policy; and ensuring that the Bank's Loan Committee had complete and accurate information regarding all aspects of proposed loans.

104.   For each loan, this information to be provided and analyzed included, among other things, the value and sufficiency of collateral, the financial creditworthiness of the borrowers and guarantors, the LTV ratio, and any other information necessary to ensure that proposed

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

loans complied with the Bank's Loan Policy and prudent, safe, and sound lending practices.

105.   The Bank reasonably reposed trust and confidence in each of the Defendants and believed they would exercise the trust and confidence reposed in them with great care.

106.   The Defendants each knew or should have known that the Bank was placing its trust and confidence in them, and the Bank did place its trust and confidence in each of them, as demonstrated by each of the Defendants being an officer and/or a director of the Bank and taking on responsibility with respect to the underwriting, recommendation, and/or approval of loans.  Trust and confidence was also placed in the Defendants because they either assisted in preparing, publicizing and/or enforcing the terms of the Bank's Loan Policy, or because each of them had read and agreed to follow the Bank's Loan Policy.

107.   With respect to the loans discussed in this Complaint, each of the Defendants possessed significant access to relevant knowledge and facts due to their special position of power at the Bank and the confidence they invited others to repose in them with respect to such loans, based on the fact that these individuals actively engaged in the underwriting, recommendation, and/or approval of the loans.

108.   As officers and/or directors of the Bank, and as individuals underwriting, recommending, and/or approving the loans discussed in this Complaint, each of the Defendants was in a special position of influence and power, and each of them exercised that influence and power in a manner that directly caused harm to the Bank.

109.   The Defendants breached their fiduciary duties to the Bank by committing the acts and omissions alleged above and, among other things:

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101

702/474-9400 • FAX 702/474-9422

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

a.   Failing to conduct the business and affairs of the Bank in compliance with all applicable the Bank policies, including the Loan Policy, and prudent, safe, and sound principles of banking;

b.   Failing to follow safeguards to prevent the Bank from incurring damages;

c.   Failing to follow policies and procedures to protect the financial stability of the Bank, and failing to take steps to mitigate or lessen damages to the Bank;

d.   Failing to follow prudent and non-grossly negligent procedures for underwriting and approving the Bank's loans;

e.   Causing the Bank's Loan Committee to approve and fund loans in violation of its policies, including the Loan Policy, and prudent lending practices;

f.   Causing the Bank's Loan Committee to approve and fund loans based on deficient collateral securing the loans;

g.   Causing the Bank's Loan Committee to approve and fund loans based on deficient, incomplete, inaccurate, or unrealistic appraisals of collateral;

h.   Causing the Bank's Loan Committee to approve and fund loans without requiring adequate sources of repayment and/or adequate non-collateral security;

i.   Causing the Bank's Loan Committee to approve and fund loans without performing the required analysis of the repayment ability and creditworthiness of borrowers and guarantors; and

j.      Causing the Bank's Loan Committee to approve and fund imprudently structured loans.

110.    As a direct and proximate result of the Defendants' breaches of fiduciary duties, Plaintiff has suffered damages in excess of $13.1 million.  The Plaintiff reserves the right to amend this Complaint to describe additional damages.

## COUNT II – GROSS NEGLIGENCE
### (All Defendants)

111.    The FDIC-R re-alleges and incorporates by reference the allegations contained in paragraphs 1-93 above as if fully set out in this Count.

112.    Under Nevada law and 12 U.S.C. § 1821(k), as officers and/or directors of the Bank, the Defendants can be held personally liable for loss or damage to the Bank caused by their gross negligence.

113.    As officers and/or directors of the Bank, at all times, the Defendants owed to the Bank a duty to not be grossly negligent.

114.    This duty included, among other things:  conducting the business of the Bank in a manner consistent with safe and sound lending practices; avoiding gross negligence in underwriting, recommending approval of loans, and approving loans; underwriting, recommending approval of loans, and approving loans in accordance with the Bank's Loan Policy; and ensuring that the Bank's Loan Committee had complete and accurate information regarding all aspects of proposed loans.

115.    For each loan, this information to be provided and analyzed included, among other things, the value and sufficiency of collateral, the financial creditworthiness of the borrower, the LTV ratio, and any other information necessary to ensure that proposed loans

complied with the Bank's Loan Policy and prudent, safe, and sound lending practices.

116.   The Defendants breached their duties and were grossly negligent by committing the grossly negligent acts and omissions alleged above and, among other things:

a.   Failing to conduct the business and affairs of the Bank in compliance with all applicable the Bank policies, including the Bank's Loan Policy, and prudent, safe, and sound principles of banking;

b.   Failing to follow safeguards to prevent the Bank from incurring damages;

c.   Failing to follow policies and procedures to protect the financial stability of the Bank, and failing to take steps to mitigate or lessen damages to the Bank;

d.   Failing to follow, prudent and non-grossly negligent procedures for underwriting and approving the Bank's loans;

e.   Causing the Bank's Loan Committee to approve and fund loans in violation of its policies, including its written loan policies, and prudent lending practices;

f.   Causing the Bank's Loan Committee to approve and fund loans based on deficient collateral securing the loans;

g.   Causing the Bank's Loan Committee to approve and fund loans based on deficient, incomplete, inaccurate, or unrealistic appraisals of collateral;

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101

702/474-9400 • FAX 702/474-9422

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101

702/474-9400 • FAX 702/474-9422

      h.     Causing the Bank's Loan Committee to approve and fund loans without requiring adequate sources of repayment and/or adequate non-collateral security;

      i.     Causing the Bank's Loan Committee to approve and fund loans without performing the required analysis of the repayment ability and creditworthiness of borrowers and guarantors; and

      j.     Causing the Bank's Loan Committee to approve and fund imprudently structured loans.

117.  As a direct and proximate result of the Defendants' gross negligence, Plaintiff has suffered damages in excess of $13.1 million. The Plaintiff reserves the right to amend this Complaint to describe additional damages.

**VI.    RELIEF REQUESTED**

WHEREFORE, the FDIC-R demands a trial by jury and judgment in its favor and against the Defendants as follows:

118.  Determining the amount of damages caused by the Defendants;

119.  Determining the amount of accrued interest (including pre-judgment interest) on such damages;

120.  Awarding the FDIC-R the full amount of damages and accrued interest;

121.  Awarding the FDIC-R its costs and other expenses incurred by it in connection with this proceeding; and

122.  Granting the FDIC-R such other and further relief as this Court may deem just and proper under the circumstances.

1

## VII.  JURY DEMAND

2      Pursuant to Fed. R. Civ. P. 38, the FDIC-R demands a jury trial

3                              MORRIS LAW GROUP

4

5      By: _/s/ Robert McCoy_____

6          Robert McCoy, Bar No. 9121
           Joni A. Jamison, Bar No. 11614

7          900 Bank of America Plaza
           300 South Fourth Street

8          Las Vegas, Nevada  89101

9
       ATER WYNNE LLP

10     Frank V. Langfitt III (*pro hac vice to be submitted*)

11     James B. Davidson (*pro hac vice to be submitted*)

12     1331 NW Lovejoy Street, Suite 900

13     Portland, OR 97209-2785

14
       Attorneys for Plaintiff Federal

15     Deposit Insurance Corporation as Receiver for Security Savings Bank

16

17

18

19

20

21

22

23

24

25

26

27

28

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422